UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JENNIFER A. MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:12-CV-390-JD-CAN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Jennifer Miller, filed for Supplemental Security Income on June 10, 2009. (R. 125) Miller alleges an onset date of April 1, 2008. (R.125) On October 2, 2009, Miller's application for benefits was denied. (R. 75) The application was denied upon reconsideration on March 24, 2010. (R. 88) On April 5, 2010, Miller filed for a hearing, which was held on January 24, 2011, in front of Administrative Law Judge (ALJ) Dennis R. Kramer. (R. 91 & 36) Miller testified at the hearing, as did Lee Knutson, a vocational expert (VE), and Norris Dougherty, a medical expert (ME). (R. 36) After the hearing, Miller's treating physician, Dr. Glazier, submitted a form clarifying his opinion of Miller's ability to perform work activity. (R. 584) On March 29, 2011, the ALJ issued his decision, denying benefits to Miller because she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (R. 30) Miller requested a review of the ALJ's decision; however, the request for review was denied on May 18, 2012, making the ALJ's decision the final decision of the

---

[1]Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue as the Defendant in this action. No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Commissioner. (R. 1, 15) On July 19, 2012, Miller filed a complaint with this court requesting a review of the Commissioner's final decision. (DE 1) Jurisdiction is established pursuant to 42 U.S. C. § 405(g).

## I. BACKGROUND

Miller was born on September 11, 1970. (R. 39) She has received her GED and has one year of college. Miller's last job was as a pharmacy technician at Walgreens in 2000. (R. 40, 41) She was 38 years old when she filed for disability benefits.

**A. Impairments**

*1. Residual Pain From Prior Traumas*

Although the record does not contain medical records for any back surgeries, Miller appears to have had back surgery sometime between 1997 and 2001.[2] (R. 42, 354) The surgery was to remove part of a disc because of a pinched nerve. (R. 42) Miller was also run over by a car in 2001. The tires became stuck, and the car had to roll over Miller's left knee to get off of her. (R. 55) Miller claims to experience pain in her legs and nerve damage in her knees from the accident; however there is no evidence in the record relating to this injury or residual pain from it. (R. 55-56)

*2. Back Pain*

Miller's back pain began around the time she started to work at Walgreens in 2000. (R. 42) In 2008, the back pain was increasing, and she began to have numbness in her left foot and left hip. (R. 354) Miller started to see Dr. Lochner on May 7, 2008, for the increasing back pain. (R. 354) A June 30, 2008, lumbar MRI showed disc protrusions at L4-5 in association with

---

[2] At her hearing in 2011, Miller claims to have had the surgery 13 or 14 years ago putting the surgery in 1997 or 1998; however she also agreed with the ALJ's math that the surgery was in 2000 or 2001. She also said that the surgery was while she worked at Walgreens which was in 2000, and her medical chart from her treating physician shows that she claimed the surgery was seven years before May of 2008.

2

degenerative disc disease[3]. (R. 349) The MRI also showed facet synovitis[4] and/or degenerative facet enhancement L3-4 and L4-5. (R. 349) A July 10, 2008, thoracic MRI showed T8-9 disc bulging. The cervical spine MRI showed scattered degenerative change, C4-5 mild to moderate left foraminal stenosis,[5] and C5-6 moderate left foraminal stenosis. (R. 350-351) By the beginning of 2010, Miller had started to use a cane. (R. 42) An August 17, 2010, MRI showed degenerative disc disease at lower lumbar levels. (R. 464) It also showed retrolisthesis[6] of L4 on L5, disc bulge, and some mild adjacent enhancement relating to scarring. (R. 464) The MRI also showed left periarticular facet enhancement. (R. 464)

By October of 2008, Miller had begun to see Dr. Glazier for pain management for her back. (R. 235) Miller received two epidurals from Dr. Glazier in October of 2008. (R. 278, 241) Miller received Sacoiliac blocks from Dr. Glazier in February and March of 2009. (R. 276-277) Miller received nine facet blocks from Dr. Glazier between March of 2009 and November of 2010. (R. 272-275; 268-271; 264-267; 256-259; 566; 562-566; 556-559; 537-541; 530-534) Miller received three radiofrequency facet rhizotomies in 2009 and 2010. (R. 260-263; 551-555; 546-549)

In addition to the periodic epidurals and blocks, Dr. Glazier prescribed Miller daily narcotics including Hydrocodone, Percocet, Flexeril, and Flecter Patch. (R. 582) The narcotics cause Miller gastric intolerance and diarrhea. (R. 582) Miller claims that the strong narcotics are the reason why she can no longer operate a vehicle. (R. 152)

While seeing Dr. Glazier for pain management, Miller also presented to Woodlawn Hospital several times for her back pain. (R.234-245) On October 11, 2008, Miller was treated

---

[3] Degenerative disc disease involves change in the spinal discs.
[4] Synovitis is a condition where the synovial membrane of a joint becomes inflamed.
[5] Stenosis involves narrowing of the spinal canal.
[6] Retrolisthesis is a condition where one vertebrae becomes displaced and moves backward toward another vertebrae.

with Dilaudid, Phenergan, and Norflex. (R. 234-240) On October 31, after receiving an epidural, Miller went to Woodlawn Hospital for her back pain and was treated with Demerol and Xanax. (R. 241-242) On December 3, 2008 Miller again went to Woodlawn Hospital and was treated with Dilaudid. (R. 243) A lumbar spine radiology showed disk space narrowing at L4-5 and L5-S1, facet joint arthropathy[7] at L4-5, and 4.5 mm retrolisthesis of L4 in relation to L5. (R. 245) On May 17, 2009, Miller's back pain was treated with Demerol at Woodlawn Hospital. (R. 246-247)

### 3. *Headaches & Asthma*

In addition to the residual pain from trauma and back pain, Miller also experiences headaches. (R. 44-45, 303) Miller believes these headaches to be caused from sinusitis. (R. 44) The headaches become intense enough to cause Miller to vomit. (R. 44-45) Miller also has an inhaler for her asthma but not a nebulizer. (R. 59, 62) She claims to have pain while breathing and to wheeze while falling asleep. (R. 59, 62)

### 4. *Mental Health*

On April 3, 2009, Miller began treatment at Michiana Behavioral Health Center for anxiety, dysthymic disorder, and major depression. (R. 414-415; 405) Miller underwent a Mental Status Exam at the request of the Disability Determination Bureau on September 8, 2009. (R. 308-312) Miller was diagnosed with a panic disorder without agoraphobia. (R. 311) She also showed signs of anxiety and mood disorders. (R. 309) On October 2, 2009, Miller underwent a psychiatric review technique. (R. 333) Dr. Horton found that she had a medically determinable impairment of adjustment disorder with mixed anxiety and depressed mood disorders. (R. 336)

On November 4, 2009, Miller went back to Michiana Behavior Health Center. (R. 404) Miller reported continued anxiety and nervousness although the medication was helping her to

---

[7] A disease of a joint.

feel less overwhelmed and defeated. (R. 404) The doctor noted that Miller's insight and judgment were somewhat improving but that there was "still a lot to do." (R. 404) On February 2, 2010, Miller had another appointment at Michiana Behavioral Health Center. (R. 405) The doctor noted Miller's continued problems with anxiety despite the fact that she was on medication for her anxiety, dysthymic disorder, and major depression. (R. 405) On July 28, 2010, Miller began treatment for her anxiety at Bowen Center. (R. 446- 452) She was diagnosed with panic disorder without agoraphobia because of the anxiety attacks. (R. 450) The anxiety attacks are coupled with excessive worry, body shakes, impending feeling of doom, and general "not feeling right." (R. 446)

     5.    *Medical Opinions*

Miller underwent a consultative exam by Dr. Barbour on Sept. 10, 2009. (R. 302-304) Miller complained of painful knees, hips, feet, ankles, and hands. She also reported numbness in both hands in the mornings. (R. 302) Miller said she could walk only a quarter of a block without having to stop. (R. 302) While Miller also stated in her function report that she did light housework, she told Dr. Barbour that she could not do light housework. (R. 149, 302) Dr. Barbour noted Miller's slow movement, difficulty getting on and off the table, inability to walk on heels or toes, and poor ability to tandem walk. (R. 302-303) Dr. Barbour's impression was that Miller had chronic back problems, recurring headaches, chronic dyspnea (difficulty breathing) with asthma, and possible carpal tunnel syndrome. (R. 303)

Miller's treating physician, Dr. Glazier, submitted a questionnaire and statement of ability to do work-related activities. (R. 579-583; 584-594) Dr. Glazier stated that he was treating Miller for degenerative cervical and lumbar disc disease and cervical and lumbar facet syndrome. (R. 580) His treatment of Miller consists of facet blocks and daily narcotics. (R. 582) Dr. Glazier

opined that Miller can walk, sit and stand for only 10 minutes at a time and 1 hour each in an eight hour workday. (R. 588) He also noted that she can walk only a few steps without a cane and should never operate foot controls. (R. 588, 589) Dr. Glazier opined that Miller could reach, finger, feel, push, and pull occasionally, but could handle continually. (R. 589) Dr. Glazier said Miller should never climb stairs and ramps, climb ladders, balance, stoop, kneel, crouch, crawl, be at unprotected heights, move mechanical parts, operate a motor vehicle, be in humid or wet environments, or be exposed to dust, odors, fumes, extreme temperatures, or vibrations. (R. 591-592) He also noted that Miller cannot shop or travel without a companion or use public transportation but could walk at a reasonable pace for one block. (R. 593) Dr. Glazier opined that Miller could not prepare a simple meal, feed herself, care for personal hygiene, or sort, handle, and use paper or files, or lift or carry more than ten pounds. (R. 593, 587)

State agency consultant J. Sands, M.D., reviewed Miller's medical records and provided a physical residual functional capacity assessment. (R. 325) Dr. Sands opined as follows: Miller could occasionally lift 20 pounds and frequently lift 10 pounds; she could stand or walk at least 2 hours (but fewer than 6 hours) in an 8-hour workday and could sit for 6 hours; her ability to push and pull was limited in the lower extremities; she was unable to walk on her heels, toes, and was unable to squat; she could tandem walk only poorly and walks slowly with a wide-based gait; she could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs; she could balance, stoop, kneel, crouch, and crawl only occasionally; finally, she would be required to avoid concentrated exposure to extreme cold or heat, humidity, noise, fumes, odors, dusts, gases, and poor ventilation; she must avoid even moderate exposure to wetness, vibration, and hazards; she must avoid slippery, uneven surfaces and hazardous machinery and unprotected heights. (R. 328-29)

**B. Hearing**

   *1.    Miller's Testimony*

Miller testified at her hearing on January 24, 2011. (R. 39) She testified about her back pain, headaches, and asthma. (R. 41, 44, 61) Miller claimed that she could sit for only fifteen minutes in a normal chair and stand for only five minutes. (R. 51-52, 64) She claimed she could only climb the stairs one step at a time and could walk for a full block at a reasonable pace. (R. 49-50) Miller claims she can kneel with a great amount of pain but cannot bend over to touch her toes. (R. 56) On a daily basis, Miller spends most of her time reclining in a chair with a heating pad. (R. 55) When Miller is not reclining, she is doing the dishes, dusting, or performing other little tasks in five to ten minute intervals. (R. 54-55) She claimed that she could lift a gallon of milk with both hands and has her boyfriend do all of the shopping. (R. 55, 51) Miller testified that her back pain is coupled with neck pain, although she hasn't had surgery for her neck. (R. 46) The pain in her neck goes across her shoulder blades and into her arms, which affects her hands. (R. 46)

Miller testified that she gets headaches about once or twice a month that stem from sinusitis. (R. 44-45) She rated the headaches at a level ten on a scale of zero to ten because the headaches get so bad that she throws up. (R. 45)

Miller testified that she also has difficulty breathing and pain while breathing. (R. 59) She claimed that she wheezes when she goes to bed at night and uses an inhaler but not a nebulizer. (R. 62) Miller also smokes. (R. 448)

Miller also testified about her anxiety. (R. 59-60) She has been having panic attacks for a long time, but the trigger is unknown. (R. 60) She testified that she experiences panic attacks two or three times a week. (R. 60) During a panic attack Miller's chest becomes tight, and she has

difficulty breathing. (R. 60) The panic attack will go away in about twenty minutes if she takes her medication. (R. 60)

Miller also testified about her last job as a pharmacy technician at Walgreens. (R. 41) Miller stood and walked most of the time that she worked but did no lifting above ten pounds. (R. 41) Her job required her to fill prescriptions and work the register. (R. 41) Miller testified that her back was hurting while she was still working at Walgreens in 2000. (R. 41)

2.   *Testimony of Medical Expert*

The medical expert testified that Miller has degenerative disease of her back and facet disease. (R. 63) He also suspected nerve root irritation and carpel tunnel but could not conclusively say because there was no objective evidence of either. (R. 63) The medical expert also testified that the treating doctor's opinions were consistent with the record and with Miller's testimony at the hearing. (R. 65)

3.   *Testimony of the Vocational Expert*

The vocational expert (VE) identified Miller's position as a pharmacy technician as semi-skilled, light work according to the Dictionary of Occupational Titles and as Miller performed it. (R. 66) The ALJ asked the VE three hypotheticals. In the first, the ALJ asked the VE to consider a person of Miller's past work, age, and education who can occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand or walk at least two hours in an eight hour workday; sit six hours in an eight hour workday; push and pull limited in the lower extremities; unable to walk on heels or toes; unable to squat; never able to climb ladders, ropes, or scaffolds; occasionally do ramps, stairs, balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme temperatures, humidity, noise, fumes, odors, dust, gases, poor ventilation; and avoid moderate exposure to wetness, vibration, hazards, machinery, heights, and slippery

8

uneven surfaces. (R. 67) The VE testified that someone with those limitations would not be able to perform Miller's past work because the two hour standing limitation limits her to sedentary work. (R. 67) The VE also testified that there were no transferable skills. (R. 67) However, the VE listed three jobs that could be done: bench assembler (such as a final assembler optical goods), inspector/checker (such as a spotter or table worker fabrication), and order clerk (food and beverages). (R. 68)

In the second hypothetical, the ALJ asked the VE to consider an additional limitation that the claimant would need a cane to walk and stand. (R. 68) The VE reported that the cane would have no impact on a claimant's ability to do sedentary work. (R. 68) In the third hypothetical, the ALJ asked the VE to add an additional limitation that the claimant was only able to walk, sit, and stand for about ten minutes. (R. 68) The VE testified that even if the claimant was able to continuously rotate among walking, sitting, and standing for eight hours, then the claimant would no longer be able to take any production type positions such as the bench assembler or inspector; however, the claimant would still be able to hold a position as an order clerk. (R. 69) The option to rotate would not, however, include the ability to recline while sitting. (R. 70) As the Dictionary of Occupational Titles does not cover sit/stand, the VE's answer to this last hypothetical was based on his own experience. (R. 69)

The VE also mentioned that the jobs he cited generally allowed a break every two hours (either fifteen minutes for a coffee break or thirty minutes for a lunch break) and bathroom breaks as needed. (R. 70) If a claimant needed to take several unscheduled breaks or longer bathroom breaks, then the claimant would not be able to keep the job. (R. 70) The claimant would also not be able to keep the job if she was absent consistently for ten percent of the time or more. (R. 70)

**C. Opinion of the ALJ**

The ALJ found that Miller had not engaged in substantial gainful activity since April 22, 2009, and had severe impairments of degenerative disk disease and disorders of the back. (R. 22) The ALJ also found that Miller had several non-severe impairments. (R. 22) The ALJ found that the residual pain from prior trauma was not severe because there was no evidence in the record to suggest that it limited her ability to perform work activity. Not even in Dr. Glazier's assessment of Miller's ability to perform work activity was the residual pain mentioned. (R. 22) The ALJ found that the headaches were not severe because there was no evidence of treatment for the headaches and because Miller had testified that she had the headaches all of her life, which means she was able to manage them while she was still working. (R. 23) The ALJ found that the anxiety was not severe because the attacks were not more than mild limitations on Miller's daily living, social functioning, and concentration, persistence, or pace. (R. 24)

The ALJ found that Miller did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926), including Listing 1.04. (R. 24) The ALJ noted that in determining Miller's residual functional capacity (RFC) all symptoms were considered, as well as the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (R. 25) The ALJ also noted that opinion evidence was considered. (R. 25) He gave substantial weight to the opinion of the State agency medical consultant, but little weight to the opinions of Dr. Glazier and the medical expert.

Consistent with the State agency consultant's opinion, the ALJ determined that Miller had the capacity to perform sedentary work as defined in 20 C.F.R. §416.967(a) but with the

following limitations: limited ability to push or pull with lower extremities; unable to walk on heels, toes or squat; can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs and balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to extreme temperatures, humidity, wetness, fumes, odors, dusts, and other pulmonary irritants; must avoid moderate exposure to wetness, vibration, and hazards; must avoid slippery, uneven surfaces and unprotected heights. (R. 25, 29)

The ALJ found that Miller was unable to perform any past relevant work because her past work as a pharmacy technician requires the ability to perform at the light exertional level. (R. 29) The ALJ found, however, that there were jobs that existed in significant numbers in the national economy that Miller could perform considering her age, education, work experience, and RFC. (R. 29) The VE testified that given these factors, Miller could perform the requirements of a bench assembler, inspector/checker, and order clerk. (R. 29) Considering the VE's testimony, the ALJ concluded that Miller could successfully adjust to other work that existed in significant numbers in the national economy and therefore was not disabled. (R. 30)

## II. STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could

differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id*. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### III. ANALYSIS

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 416.920(a)(4)(i)-(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 416.920(a)(4)(i)-(ii). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 416.920(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 416.920(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**A.     Residual Functional Capacity**

Miller alleges that the ALJ erred in not giving the opinion of the treating physician, Dr. Glazier, controlling or significant weight. (DE 25 at 11) Miller claims that the ALJ did not have a reason to dismiss Dr. Glazier's opinions and that the ALJ's rationale was unsound. (DE 25 at 12)

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if the opinion is supported by the medical findings and consistent with substantial evidence in the record. *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(e)). While the treating physician's opinion is important, it is not the final word on a claimant's disability. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2004). An ALJ, thus, may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other substantial evidence in the record. S.S.R. 96-2p at 4; *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). Ultimately, an ALJ may discount a treating physician's opinion as long as the ALJ minimally articulates his reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

Without any discussion about the above legal standard for the weight given to the opinions of physicians, the ALJ here simply stated that the opinion of Dr. Glazier, the treating physician, received little weight because his opinion was "inconsistent with the record." (R. 27) Dr. Glazier completed a physician questionnaire (questionnaire), after which he was asked to complete a medical source statement of ability to do work-related activities (physical) to provide further medical rationale for his findings. (R. 27) The ALJ lists two inconsistencies between Dr. Glazier's opinion and the record. (R. 28) The ALJ also points out that when asked for clarification of his opinion, Dr. Glazier did not provide further rationale on the physical but did add more limitations for Miller. (R. 27)

The ALJ's articulation of his reasons for not giving Dr. Glazier's opinion controlling weight was insufficient. Significantly, the ALJ did not say that Dr. Glazier's opinions were inconsistent with the MRIs, X-rays, or progress notes; in fact, the only part of the record that the ALJ identifies as contradictory to Dr. Glazier's opinion is Miller's testimony. (R. 27) The ALJ

pointed out that Dr. Glazier limited Miller to ten minutes of sitting, while Miller testified that she could sit for fifteen minutes and actually sat for longer while at her hearing. (R. 28) The ALJ did not explain why he found a five minute discrepancy to be so significant to not give Dr. Glazier's opinion controlling weight—or any weight, for that matter. Furthermore, Miller's ability to sit for more than fifteen minutes at one hearing has little or no bearing on her ability to sit at a job while attempting to work productively on a daily basis.

The ALJ also pointed out that Dr. Glazier opined that Miller could never climb stairs, while Miller testified that she could climb stairs. (R. 28) What the ALJ neglected to include in his opinion, and apparently his consideration, was that Miller stated she could only step up a couple of stairs, and then only if she held onto the handrail. (R. 48) Miller also testified that she went slowly and had to bring both of her feet onto the same stair before stepping onto the next one. (R. 48) The ALJ did not explain why he did not consider Miller's full testimony, which when read as a whole takes on a completely different meaning and appears entirely consistent with Dr. Glazier's opinion that she should not perform work that requires her to climb stairs.

The ALJ also did not explain why he thought Dr. Glazier's medical rationale for the limitations he placed on Miller was insufficient. On the questionnaire, Dr. Glazier cited to non-specific lumbar and cervical MRIs as necessary to evaluate Miller's condition, and on the physical when asked to identify particular medical findings to support the assessment, Dr. Glazier referred to Miller's degenerative disk disease and facet arthritis. (R. 582, 587-593) Although Dr. Glazier did not refer to the MRIs by date on the questionnaire, Miller underwent only three MRIs in June 2008, July 2008, and August 2010. (R. 349-351, 464) The three MRIs were consistent with each other, showing degenerative disc disease, which is exactly what Dr. Glazier referred to on the physical when asked to identify particular medical findings to support

15

the assessment. (R. 349-351, 464, 587-593) The ALJ did not explain why he thought it necessary for Dr. Glazier to specify which of the MRIs he was referring to or why listing Miller's medical conditions was insufficient to explain Dr. Glazier's reasoning behind the limitations he placed on Miller.

In sum, the ALJ did not explain why he found a five minute discrepancy to be significant, did not explain why he did not consider Miller's full testimony regarding her ability to climb stairs, and did not explain why he thought Dr. Glazier's medical rationale for the limitations he placed on Miller was insufficient. Because the ALJ did not minimally articulate his reasoning for not giving Dr. Glazier's opinion controlling weight, this case must be remanded.[8]

In addition, the ALJ's RFC determination was flawed because he did not discuss or incorporate any of Miller's non-exertional limitations. At the second step of his analysis, the ALJ noted that Miller has a number "non-severe" impairments causing only minimal limitation in her ability to perform basic work activities. These included residual pain from prior trauma and, more significantly, persistent headaches and anxiety. (R. 23) Beyond finding these impairments "non-severe," however, the ALJ did not discuss their effects on Miller's RFC or include any non-exertional limitations in his hypotheticals to the VE. The law is clear, however, that an RFC finding must be assessed based on all the relevant evidence in the record, 20 C.F.R. § 404.1545(a)(1), and that an ALJ must consider all medically determinable impairments even if not considered "severe." 20 C.F.R. § 404.1545(a)(2); *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). Specifically, the Court notes that although Miller has apparently been able to work in the past despite her headaches and anxiety, such limitations may have a more limiting effect on

---

[8] Moreover, the ALJ's rejection of the medical expert's opinion was also based on an apparent exaggeration of the discrepancies between Miller's testimony and Dr. Glazier's opinion. The ALJ should also revisit this evaluation on remand.

16

her ability to perform sedentary work than her previous employment or may be more debilitating when combined with her new physical limitations.

**B.      Credibility Determination**

As to the credibility finding, Miller contends that the ALJ erred when evaluating Miller's pain because he did not discuss Miller's dosage of narcotics or other treatments as evidence of her level of pain. (DE 25 at 16) Because this case will be remanded based on the RFC, this Court has no need to make a finding on the credibility issue. The ALJ questioned Miller's credibility based on her testimony at the hearing, her statements during her consultative examination, and her statements on her function report. (R. 26-27) However, on remand, the ALJ should revisit his credibility finding as this Court is troubled by the ALJ's treatment of Miller's testimony and evidence.

First, the ALJ incorrectly stated that Miller's back spasms were controlled with medication. (R. 26) Dr. Glazier specifically wrote on the questionnaire that the spasms were *not* controlled. (R. 581) Second, the ALJ made great ado about Miller's statement during her consultative examination that she could not walk more than a quarter of a block but testified at her hearing that she could walk a full block. (R. 27) The ALJ failed to explain why the difference between a quarter of a block and a full block was so significant.

Last, the ALJ made sure to point out at the hearing and in his opinion that Miller sat in a normal chair at her hearing despite testifying that she never sat in a normal chair. (R. 26, 55) The ALJ seems to have taken Miller's statement too literally. *See Beier v. Colvin,* 2013 WL 1122732 (N.D. Ind. 2013)("When a person says that she sleeps all day, she doesn't mean it literally; she means that she is abnormally sleepy and listless and dozes off frequently.") There are times and circumstances when one does not have a choice of chair in which to sit. Miller does not mean

that she will literally never sit in a normal chair; she means that she will never choose to sit in a normal chair when given an option. The ALJ also made sure to point out at the hearing and in his opinion that Miller sat in the normal chair longer than the fifteen minutes that she claims to be able to sit in a normal chair. However, the ALJ neglected to include in his opinion that Miller needed to bring a pillow with her, that Miller rarely, if ever, sits in a normal chair, and that there is a difference between sitting in a normal chair for one hearing and sitting in a normal chair every day while trying to be a productive employee.

This Court is troubled by the fact that the ALJ not only inaccurately represented details of Miller's testimony, but also based his credibility finding, in part, on an incorrect understanding of the facts. The ALJ will need to address the above issues with the credibility finding as well as the RFC finding.

**C.     Remand**

On remand, the ALJ should add a discussion of the legal standard and analysis regarding treating physicians. The ALJ should then adhere to that legal standard by further explaining why the two inconsistencies were significant enough to warrant not giving Dr. Glazier's opinion controlling weight and why Dr. Glazier's rationale was insufficient. The ALJ must also consider to what extent Miller's RFC is affected by her "non-severe" non-exertional limitations and include such limitations in a hypothetical to a VE, if appropriate. Finally, the ALJ should revisit his credibility determination and address the concerns identified above.

In addition, the ALJ should pose a hypothetical to the VE that reflects Dr. Glazier's opinion. When the VE testified, the ALJ's hypothetical included the ability to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk at least two hours in an eight hour workday, sit six hours in an eight hour workday, and occasionally do ramps, stairs,

balance, stoop, kneel, crouch, and crawl. (R. 67) This hypothetical does not accurately reflect Dr. Glazier's opinion that Miller could never lift or carry even ten pounds, could sit, stand, and walk for only one hour each in an eight hour workday, and could never do ramps, stairs, balance, stoop, kneel, crouch, and crawl. (R. 587). Because the hypothetical does not accurately reflect Dr. Glazier's opinion, the Court would not be able to determine whether Miller is entitled to a finding of disabled even were it to give Dr. Glazier's opinion controlling weight. On remand, therefore, it would be helpful if the ALJ supplemented the record with evidence of whether Miller would be disabled based on the limitations described by Dr. Glazier.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Miller's request to remand the ALJ's decision. [DE 1]. This case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED: July 2, 2013

                                                                    /s/ JON E. DEGUILIO  
                                                                    Judge  
                                                                    United States District Court